It is in Appeal No. 2011-1245, Raytheon v. Indigo Systems. Good morning, Mr. Landau. You may begin. Thank you, Your Honor, and may it please the Court. I'm Chris Landau, and I'm here today on behalf of Raytheon, the appellant. The District Court erred by holding on summary judgment that Raytheon's trade secret claims against Indigo are time-barred as a matter of law, notwithstanding Indigo's repeated written and oral assurances that it had implemented specific policies and procedures to protect those secrets. Those assurances were made by Indigo's principals and outside counsel in response to Raytheon's affirmatively raising concerns about trade secret disclosure by former employees. Could I tell you, there's one thing that I'm puzzled about here, which makes it difficult for me to understand the arguments by both sides, and that is I don't see that we know when this alleged trade secret misappropriation took place. I mean, you, of course, say you reverse-engineered one camera in 2004, but I don't see anything in the briefs about when the alleged misappropriation began. Am I missing something here? Well, we don't know when it actually began, Your Honor. I think the question is when did we know or have reason to know the facts underlying the claims? That's the discovery accrual rule as a general matter. Well, if there hadn't been any misappropriation in 1997, then all this back and forth is sort of irrelevant, right? Well, that's a fair point. We don't know when it actually began. They are asserting that we must have known or should have known of these claims more than three years before filing. I think your point is a fair one, that basically nobody knows when it began. All we know is that when we reverse-engineered a camera in the fall of 2004, that set in motion a process where we said, oh my gosh, there's some legal issues here, and eventually that led us to uncover trade secrets. We don't know when exactly that started. The whole point of coming to court was to try and bring a trade secret claim, and then these folks who had said, we're going to put these specific policies in place, people are going to work on different areas than they worked in at U, suddenly turned around and said, well, guess what? You should have sued much earlier. You knew or should have known. We said, what are you talking about? I guess your argument is if there was trade secret misappropriation in 1997, they gave us assurances which told the statute of limitations. If the trade secret misappropriation took place later, there wasn't any basis for later suspicions. That's exactly right, Your Honor. In other words, I think the real question is, are we entitled to rely on their assurances? They take the position, which is somewhat of a curious position when you think about it, that notwithstanding all these assurances, and the district court didn't deny that there were assurances and that we were entitled to rely on them, the district court took the position that our reliance on those assurances became unreasonable as a matter of law at some point in the early 2000s. The district court identified two bases for his decision on that score. First, he said, well, you should have known they were your competitors because they'd won some contracts. I think the answer to that, Your Honor, is that the fact that somebody wins a contract doesn't necessarily mean that they won it because of trade secret misappropriation. The record here contains specific evidence that we attributed, and I think this is quite reasonable, their success in winning those contracts to the fact that they got the contracts from Northrop Grumman. What allegations are in your complaint regarding misappropriation? When do you allege that the misappropriation occurred or began? Well, we certainly allege that we don't know when it began, Your Honor, and what our point is is that we have a fraudulent concealment cause of action that is alleging that to the extent that they are bringing a time bar defense, that that defense is meritless. Or premature. Right, exactly, and again, let me just underscore one point again. We are not saying that we win as a matter of law. What we're saying is, at the very least, a jury could find that those assurances, which were not limited in time or did not have any kind of expiration date on them, were still in place. And the thing that the district court relied on to say that we were unreasonable really doesn't hold water. Were there earlier versions of these cameras before 2004 that were reverse engineered and that are the subject of expert reports that have been submitted? No, Your Honor. This was the first one that was reverse engineered. So they won these… No, I don't mean at the time. I understand that there wasn't any reverse engineering of earlier versions at the time. I'm saying in preparation for trial, did you get other versions of this camera and reverse engineer them? I'm not aware that we did, Your Honor. I think that the record doesn't indicate that. So we reverse engineered this one, and then the trade secret claim is based on the technology that we found in this camera. It's not clear that the cameras that were the subject of the contracts that the district court relied on had this particular technology. The district court just seemed to say, well, you knew that they were a competitor, and that alone should have, I guess the reasoning is, made the assurances go poof. And our point here today is that there were ample reasons, and the record reflects this, that the mere fact that they won those contracts wasn't any kind of conclusive showing that they must have been stealing our trade secrets. Well, were there points in time where, other than the tolling period that the parties agreed to, where there weren't employees being taken away? Your Honor, I think the record now reflects that the employees were going over, starting almost as soon as Indigo started. Indigo started as a breakaway from us. It was a startup company. When they started, they said, look, we're going to protect your trade secrets. We realize that's a sensitive matter. Then, really, things hit the fan in early 1997 when we sent a letter to Indigo saying, we are very concerned about the trade secret issue. And that's the point at which their president, their outside counsel sent us letters saying, it's inaccurate and offensive. Let me tell you guys, we are taking your former people, we're putting them in different jobs, we are instituting specific policies and training, and they took their training manuals to us. And they walked us through this. One thing that's important to keep in mind is this is not two companies that are mortal enemies that have no contact. This is in a small Santa Barbara research community where these folks are seeing each other, and the record is full of lunches where they're bringing their manuals, they're providing constant reassurances, at least up until 1999 to 2000 time period. And even then, it's not as if suddenly they said, we're withdrawing the assurances. There's never a moment that the district court identified where the assurances all went poof. The district court, I think, erroneously said, all the assurances are contained in the agreement, I think, to which Your Honor was referring, and that agreement expired in 1998. Well, that's clear error because the district court itself recognized there's an entire web of assurances, both written and oral. And that particular agreement simply had a much more limited scope. That said, well, we won't hire any of your people for six months from, I think it was July 1997 to December 1997. And then we'll give you notice from January 1st, 1998 to July 1998. And then it reaffirmed that we have all these policies in place to protect trade secrets. But there was no indication that all of the assurances that had been given and all these company policies that had been put into place would expire along with that contract. Does the fact that there were all of these contacts back and forth and all of these assurances requested and assurances given indicate that there was an awareness that there could be a risk of trade secret misappropriation all along? No, I don't think so, Your Honor. I think it reflects the fact that these guys were friends and colleagues. They continued to have a confidential relationship where we were basically doing joint ventures up until 2000. We continued in collaboration up until 2005. I think if you look at the record, you'll see this kind of stuff came up at lunches with people. These are folks who went out on bike rides together. I think there was a real sense of betrayal on the part of the Raytheon people when they found this out. And is this similar to the situation in C-TRAX or not? No, Your Honor. I think there's a fundamental distinction in C-TRAX. It is not an assurances case. In other words, it seems to me that a company has to do something when there are these kinds of storm warnings or red flags. And in C-TRAX, the company did nothing. I think the difference here is that we went to them. We sent that letter on February 2, 1997. That's JA-143. We sent that letter. We said we are very concerned about this. In response to that letter, they sent us back the letter from their president with specific assurances. C-TRAX has none of that. I think the thing is, you should be able to rely on those kinds of assurances. And at the very least, it creates a jury question as to whether at what point reliance on the assurances might or might not have become unreasonable. They have cited not a single case in the history of American law involving assurances at all, frankly, much less the kind of repeated assurances here where summary judgment was either granted or affirmed. They are certainly entitled to say, to the trier of fact, this is awfully long, folks. They should have wised up earlier. It's not the most appealing argument in the world, but they're certainly entitled to make it. But what the district court here went off and said, as a matter of law. The other point I wanted to highlight was the district court relied on the purchase of the Merlin camera in March of 2004. And the district court said, well, you must have bought that camera based on preexisting trade suspicion, trade secret misappropriation suspicion. The record is directly contrary to that. There is direct record evidence that that camera was purchased for routine competitive purposes unrelated to trade secret misappropriation. So that was not an appropriate determination for the trial court to make at the summary judgment stage. Again, I think the assurances here is what distinguishes this case from C-TRAX and makes it an inappropriate vehicle for summary judgment. Okay. You're into your rebuttal period. Would you like to reserve it? Yes, Your Honor. I'd like to reserve the balance of my time. Thank you. Okay. Very good. Mr. Collins. Good morning. Thank you very much. Michael Collins on behalf of the defendants of Pelley's, Fleer, and Indigo. May it please the Court. Two issues in this appeal. Did the district court correctly grant summary judgment for Fleer and Indigo concluding that Raytheon's misappropriation claims are time barred? We believe the answer to that question is yes. That decision should be affirmed because it was correct. Let's suppose we were to conclude that the statements made by Indigo in 1997, perhaps 1998, were sufficient that there's at least a genuine issue of material fact as to whether Raytheon could rely on those. What happened after 1998, in your view, to raise a new suspicion on Raytheon's part that there was misappropriation? Substantial things, Your Honor. One, we started competing with them, and they knew we started competing with them in the actual space they were in. Two, we compete with them on two substantial government contracts, extremely large government contracts. Okay, but is there evidence that this competition couldn't have taken place without the use of the trade secrets that are at issue here? I don't think – no, actually. So, Your Honor, stepping back is obviously we don't concede we took their trade secrets. I understand. So, I think the evidence is, Your Honor, based on the standard for discovery rule and fraudulent concealment, is that gave them reason to have to – a prudent person would have stepped back and say, wait, that's a red flag. Why is it a red flag? I mean, if these cameras could be produced using different kinds of technology, why does the fact that they're competing, that Indigo is competing with Raytheon, suggest that there's misappropriation? I mean, it could just be a different technology that didn't utilize the trade secrets, right? It could have been, but the standard, we believe, Your Honor, for discovery rule and fraudulent concealment is suspicions should abound, according to the C-TRAX decision, when employees, your former employees, go to someone else and they start manufacturing a similar product. But those employees had provided through the company assurances that there was no misappropriation. So, what you have, it seems to me, is nothing but competition, which doesn't necessarily raise a red flag. But those assurances, we believe, Your Honor, at least the written ones, stop in 1998. It's unclear from the record, and they have the burden of proof, both on the discovery rule and fraudulent concealment, of when these alleged assurances continue. You mean they have to keep asking for assurances every year, every six months? Well, we don't think, so first of all, we don't think denials of liability are sufficient. And on page 44 of our brief, footnote 158, we cite... Well, I've seen those cases. There's a lot more than that here. Oh, understood, Your Honor. But there's also a lot more for why they should have been suspicious. I'm not saying we did anything wrong, but they should have been suspicious. Additional employees keep on moving. We start competing with them with a similar type product. Apart from that, apart from the competition and the employees moving, what evidence is there post-1998 that Raytheon should have had a suspicion? Besides the government contract, besides the competition, besides employees moving, that's the most substantial evidence. And during this period of time, Indigo and Raytheon are still working together on other collaborative agreements. Isn't that right? Well, Your Honor, we go through that in detail in our brief. That's an allegation they make, but we break that down. Those are isolated situations, a couple that didn't actually go through, but very isolated situations. There was no collaborative relationship. But there was isolated working together. Well, that happens all the time, for example. A supplier to a company could be stealing your trade secrets, and the fact that they're doing business with you on an unrelated product would not toll the statute of limitations. You still have to be vigilant. You still have to say to yourself, is there a problem here? How can you characterize the trial judge's conclusion with respect to the purchase of the camera as anything other than a decision of fact? I mean, he interpreted that purchase despite a statement by Raytheon that it was not because they already suspected something, and he made a finding of fact. How can you do that at summary judgment? Your Honor, we think the decision as a whole is correct. If that's in isolation, we could understand that that could raise some concern. So you agree that at least you'd have to take that out of the equation? Right. The camera purchase. I think we conceded in our brief, Your Honor, taking that in isolation, we would not try to support the grant of summary judgment based on that one fact. But the decision… You agree it doesn't help you. It doesn't help me. No, it doesn't, Your Honor. It doesn't help my client. No, it does not. I would absolutely have to agree with that. But the important point is, Your Honor, is just like a contract or a statute, we believe the decision should be read as a whole, in each sentence and each phrase in the context of the whole. And what did he say is, given the context of all the red flags there, that was one he found. Well, what are the red flags? I mean, apart from competition, apart from hiring employees, there aren't any red flags, are there, after 1998? Well, I think those, I say, are those the ones that should have been, and we believe based on C-TRAX and other decisions, those are the red flags that they found existed in that decision that supported the grant of summary judgment. This is a different case from C-TRAX, is it not? The facts here are quite different from C-TRAX. Well, they alleged because of these alleged assurances. But what happens after these alleged written assurances? And again, they had the burden of proof. And we believe this evidence, which was found, is probably more substantial as the district court found the time period in C-TRAX was less than the time period here after the alleged written assurances. I don't think you can completely discount the assurances. There were several that were serious, that were discussed at length, and discussions back and forth. It strikes me as just not something trivial. Oh, no, absolutely not, Your Honor. We're just saying what happens after 1998 is the critical issue. So are you saying there were no reassurances after 1998? No, Your Honor. I know they allege there are, and the record, as far as the way we looked at it, was unclear as far as when they took place. I think they alleged oral assurances afterwards. But those are a little bit more murky. But again, what's going to happen if you ask any of your competitors, are you stealing from me? You're going to get an answer of no. Where are these facilities located? In Goleta, California, Santa Barbara area. Isn't it fairly common for people to switch jobs in this industry? It probably is, Your Honor. I can't tell you as a fact that it is, but it probably is. It doesn't seem to me that switching jobs is a red flag when everybody's switching jobs all the time. Well, I think, again, what we're talking about is high-tech industry. People move all the time. California has a strong public policy to allow people to leave. And moved on to other businesses that exist in the law. But again, we're looking at what the C-TREX court, which we believe is binding on this court. We understand the court may find it's distinguishable because of the assurances. But let's put the assurances aside. People moving, they say that's a red flag. They have rumors also. They have rumors. There were rumors in C-TREX. There weren't any post-1998 rumors there. Right, but no rumors, maybe. But we'll have to develop the record on that. But what do we have? Suspicions back in 97. We had suspicions in 98. We think you guys are stealing from us. So these are people who already have a red flag in their head. And they say, oh, we got these assurances. Everything's okay now. Why was there no conflicts of law analysis with respect to whether it's Texas or California law that applies in these circumstances? I think the court determined that there would not be any distinction that would matter. So therefore, a choice of law analysis on that wasn't important. I think the choice of law analysis to the parties became more important when the attorneys issue came up. But isn't there a big difference in the equitable tolling law in Texas and California? Well, we wouldn't think so, Your Honor. Again, we think it's a discovery rule and fraudulent concealment. And again, you have to act reasonably when a reasonable person would believe there are facts on which they should investigate. And we think that's the standard under both. We have some better language from C-TREX, Candley, that we like a lot. It's learning to go do. Obviously. Yes, absolutely. So obviously being candid with the court is we like Fifth Circuit law, which we think is binding in the court anyway. That was applying to Texas law. But we don't think the law is that much different because, again, the courts have recognized that you have to be vigilant. And you can't ignore red flags. And they say these assurances allow them to put their head in the sand forever. And based on C-TREX, another decision is let's take the assurances out, which ended, at least in writing, in 1998. And then from there, what do we have? Not just an isolated employee leaving. We had 50 employees leave as of end of 2000. We had 79 employees leave as of end of 2003. We win two big government contracts and we're doing something similar. You already thought we were stealing from you. Wouldn't a reasonable person say, let me look at that again? And the big question is, and we think the relevant issue is, what changed during that time period? What changed from before March of 2004 to after March of 2004? Assurances. Assurances. Well, I don't think there's evidence that the assurances went all the way through March of 2004. And I could be wrong on that and they could maybe correct me on that. But assurances go back a ways unless there's these alleged oral assurances and we'd have to see when those would happen. But again, you're always going to get an assurance from a competitor that they're not stealing from you, especially when they don't think they're stealing from you. Because that's the basic point here. We don't think we were stealing. So I guess the only way those statute of limitations could start to run is if we said we're stealing. And that can't be the law. So the law is, what would a reasonably prudent person do under the circumstances? And are there red flags that would put you on suspicion? I mean, your argument's good, but it sounds so much like a jury argument. That's what my problem is. Well, it does to a certain extent. But that's why we step back and say they had the burden of proof. And what changed? Why did they suddenly go and buy a Merlin camera? They say for competitive reasons. But you just admitted that doesn't help you. It doesn't help me. I'm saying it hurts them, though. Why did they wait? They could have done that at any time. But I think it hurts them because they can't explain why. On the jury question, what happened, though, after March of 2004 that all of a sudden you became suspicious? You say because you looked at your employee records that you had. You had your employee records. You know that lots and lots of employees are leaving. And you say you bought a Merlin camera, even though you had a few Merlin cameras already. And you could have bought a Merlin camera. And they cite some cases where they say it's told for a certain period of time. And a couple cases we distinguish on the grounds that you couldn't have got the product in question because it wasn't out in the market yet. But the Merlin camera was out there. So, what changed during that period of time? Nothing. Now, we have our suspicions of why they all of a sudden decided they were going to look at it. We don't have to get into motive here today. That's not the relevant issue. But the real point is, based on the existing state of the law, they had an obligation when those red flags were there. And we believe it's that simple. And that's why the court correctly granted summary judgment. And since it's a de novo review, we respectfully submit we don't have to worry about certain isolated language in the district court's decision that may indicate that was a question of fact. As he said, it's the totality of all the circumstances. Would you like to reserve the rest of your time? Yes, Your Honor. Thank you very much. We never did get to the process. Mr. Landau. Thank you, Your Honor. I'd like to make three quick points if I could. First, my friend said that repeatedly, the burden is on us. Well, of course, they are the party moving for summary judgment. So, the burden is on them to show that no reasonable fact finder can find this. Second, I think Judge Sykes, you asked the question, what happened after 1998 to kind of make the assurances, reliance on the assurances unreasonable? I think you got three answers to that. First, you were in competition with them. Second, they won two contracts. Third, employees moved. None of those points in and of itself is enough to say, as a matter of law, the assurances go away. Because none of those in and of itself, especially in light of the assurances, which were never qualified or withdrawn, is inordinately suggestive of a trade secret misappropriation. They could have won the contracts for other reasons. And going to your point, Judge O'Malley, they are perfectly entitled. We're not denying them the right to try to make that argument before a jury. We're just saying we would like our day in court to try to make our opposing argument before a jury. The error here, this leads me to my third point, which is that the district courts decided this as a matter of law, relying primarily on two considerations, one of which was abandoned, I think, rather explicitly here this morning, the purchase of the Merlin camera. Although they still try to kind of shoehorn it back into their argument, I think it is quite clear, as Your Honor's question suggested, that the district court made an adverse factual finding when there was direct testimony in the record that we purchased this for other reasons. They try to pooh-pooh that and say, well, that was just one minor factor in his decision. But with respect, the court itself said on page 812 of the joint appendix, the most damaging factor for Raytheon is what he characterized that as. Because he says there's no change in circumstances. They actually try to emphasize this as well here this morning. He says, well, there was no change. That's our point. They made the assurances. Then there was no change in circumstances. So what is it that they are pointing to that makes the assurances go poof? Again, if it's not the law, and we cite many cases in our brief, Massachusetts Eye and Ear, Porex, Tracer Lab, Callaway, that say a couple of things. The fact that you're in competition in and of itself doesn't indicate that you should be suspicious of trade secret misappropriation because not every competitor is stealing trade secrets. The fact that they won some contracts, again, doesn't mean that they necessarily were engaging in trade secret violations. Again, they're free to argue that to a jury. It's a decent jury argument. We're not saying it's not plausible. Do you agree that there's no need for a conflict of law analysis here and that Texas and California are the same on these issues? On the underlying substantive issues, yes, and we specifically took that position from the very outset. In all of our complaints, we pleaded this trade secret claim under both California and Texas law. Then we said to the district court— But the statute of limitations issue. Yes, the three-year statute in both. We don't think that the provisions for tolling, that any of that fraudulent concealment, that there's any material difference between California and Texas with respect to any of those. There is a difference between California and Texas if you do reach the attorneys' fees issue, and I'm prepared to speak to that if Your Honor would like. Obviously, if the summary judgment is reversed, you don't get there. I guess just in 30 seconds on the attorneys' fees issue, we think that, again, the district court didn't reach the choice of law. They say, well—and we say at the end of the day, they were the ones that were insisting that this should be governed by California law. How can you do a choice of law when you file a cause of action under a statutory provision? So your statutory provision is Texas. You have a separate cause of action with respect to misappropriation under California law, but you've got a separate independent claim under Texas statute. So how can Texas law not apply to that? Well, Your Honor, again, I think if you look at that, if you look at the first page of our complaint, each one of them say trade secret misappropriation in violation of California and Texas law, A83 and A99 say that. Count five of both of those complaints is alleging a trade secret violation. Now, to be sure, the heading of the—I think it was count five—says trade secret misappropriation and violation of Texas law. So you've got statutory claims and common law claims, but the statutory claim is clearly under Texas law. Well, I think, Your Honor, we were—but again, we just as equally pleaded the California statute. We didn't put it in the title of the thing, but if you go back to A83 and A99, we were invoking both California and Texas law. I think it's because we weren't necessarily taking a position on that. Just like you can say, look, I'm going to bring a claim. We cited the California statute and the Texas statute. It can't be that both simultaneously govern—because there was a California statute. We weren't saying California common law. So we brought a trade secret statutory claim under both. It can't possibly be— But one allows for a payment of attorney's fees and another doesn't, and you brought both claims. Somehow California statute trumps the Texas statute? Sure. If the trade—if you ultimately get to a choice of law analysis for the trade secret claim and it's governed by California law, then you get whatever remedies you're entitled to under California law. All right. That will have to conclude your argument. To be trusted, your time. Thank you very much. Thank you, Your Honor. All right. Mr. Collins, do you have any brief comments on the choice of laws that relates to the cross-appeal? Yes, Your Honor. I think it's very simply they chose to assert a claim under Texas law, a statutory claim. They didn't have to do it. They did it. They also sued us in Texas based on saying they had a presence in Texas. They requested damages and they requested attorney's fees. So the court had to address the Texas law claim. They didn't argue in summary judgment that Texas law didn't apply to their Texas statutory claim, that California law applied. These are good lawyers. They argued it, like the other ones, on the merits, saying it wasn't time barred. But even if you're entitled to fees under the Texas statute, wouldn't the court have to do some apportionment to determine what portion of the fees expended related to that claim as opposed to some other claims? Oh, certainly. Certainly. Now, we'd have arguments why it was all the same thing, but certainly that's an issue the court would have to address. I'm sure the court would want briefing on that legally since if it's relevant to one claim or it's relevant to two claims, if you had to do the same work anyway for that one claim that is covered, we'd make legal arguments on that. But certainly they'd be able to argue that and the court would certainly want to address that. And that's our point is it's not an issue whether we're entitled to. It's an issue of at best amount. But that's why we believe the district court erred on that issue, that they asserted the claim. They asserted a claim for attorney's fees under that statute. It's mandatory in that statute. It says shall. There are more unfair notice that the prevailing party under the plain language of the statute was going to get attorney's fees. The district court said based on Twombly and Iqbal, we did not properly plead it. We believe that Twombly and Iqbal are an apposite because they deal with the amount of facts you need to plead to demonstrate that a claim is plausible, factually plausible. That's not the issue here. Our request for attorney's fees was plausible based on the claim that they pleaded. And we believe we presented substantial authority that you don't have to plead a request for attorney's fees under federal law, especially when that request for attorney's fees is under a mandatory fee-shifting statute to the prevailing party. We also believe the district court, and I have this in our brief, that the district court did not properly apply 54D of the Federal Rules of Civil Procedure, did not properly apply Rule 54C of Federal Rules of Civil Procedure. So for all those reasons, we believe we're entitled to an award of attorney's fees subject to determination of amount on remand. And just very briefly, I don't know if I can go back to the other point. They made the argument that since we moved for summary judgment on the time bar issue that we had the burden of proof, we cite substantial authority. That's not a proper cross-appeal. Oh, okay. I'm sorry, Your Honor. Okay. Not proper rebuttal on your cross-appeals. Okay. That will conclude the argument. Thank you very much. Thank you, Your Honor. The case is submitted.